IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 28, 2006 Session

# WILLIAM B. THURLBY v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Sevier County**
**No. 2000-940     Rex Henry Ogle, Judge**

———————————

**No. E2005-00648-CCA-R3-PC - Filed July 10, 2006**

———————————

The petitioner, William B. Thurlby, appeals the dismissal of his petition for post-conviction relief, arguing ineffective assistance of both pre-arrest and trial counsel, the State withheld evidence and failed to make an election of offenses, his due process rights were violated, and the cumulative effect of the various errors resulted in the denial of his right to a fair trial. Following our review, we affirm the dismissal of the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Paul G. Whetstone, Mosheim, Tennessee, for the appellant, William B. Thurlby.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The facts in this matter were set out in the direct appeal:

Jeff McCarter testified that he is a detective with the Sevier County Sheriff's Department. He said he was dispatched to the victim's apartment on the evening of Sunday, January 21, 1996. He said he found the victim's body lying on its back in the floor of the living room. He said he made a videotape of the scene, and the videotape was played for the jury while Detective McCarter explained what he saw. He said the victim had silver duct tape around his ankles and was wearing sweat pants. He said that from the waist up, the victim was covered by a large, white linen

bag. He said the bag was later removed, revealing that the victim's hands were bound by duct tape across the chest, with one arm lying over the other. He said there was a jagged tear or cut in the bag on the opposite side from the victim's face.

Detective McCarter said that each of the victim's legs was individually taped and then taped together. He said the victim's clothes were pulled around his waist, indicating that the victim had been dragged backwards with his feet toward the door. He said the victim's button-up shirt and T-shirt were bundled underneath him. He said the victim's hands were tightly bound, and each arm was bound individually and then together. He said the victim had relatively fresh wounds on his knuckles and hands, abrasions on his nose and face, and a wound or scratch on the left side of his abdomen. He said there was a clump of hair near the victim, and blood was on a shirt.

Detective McCarter testified that his first contact with the defendant was on the Tuesday following the victim's death. He said he drove into the defendant's driveway, but a vicious dog was outside, and he did not get out of the car. He said that instead, he blew his horn for three to five minutes, but nobody came outside. He said he drove across the street and pulled into a gravel parking lot from which he could observe the defendant's driveway. He said he called Agent Davenport and Captain Larry McMahan and told them what happened. He said they met him in the parking lot, and Agent Davenport called the defendant. He said Agent Davenport spoke with the defendant and told him they were coming to his home. Detective McCarter testified that when they drove across the street to the defendant's home, the defendant was standing in the driveway next to his car and had keys in his hand. He said they explained to the defendant that they were investigating a homicide, and the defendant invited them into his home.

He said that he, Agent Davenport, Captain McMahan, and TBI Agent Steve Richardson accompanied the defendant into his home. He said the defendant mainly talked to Agent Davenport. He said he observed the defendant and noticed that the defendant kept his right hand either underneath him or in his pocket during the conversation. He said that when the telephone rang, the defendant reached out with his right hand, and he noticed that the defendant had fresh scratches on the back of his hand. He said the officers began to leave because the defendant said he had no information about the victim's death, but he and Captain McMahan went back to ask the defendant about the scratches on his hand. He said he examined the back of the defendant's hand and saw two long scratches. He said the defendant explained that briars caused the scratches while he was chopping wood. He said that ten days later, he obtained a search warrant and took photographs of the scratches. He said that by then, the injuries had substantially healed.

On cross-examination, Detective McCarter said that the defendant's friends

confirmed that the defendant frequently chopped wood, and he admitted that the defendant's home was in a wooded area. Detective McCarter stated that the defendant came to the detective's office on January 30 and gave a statement. He said the defendant admitted that he was at the victim's apartment on Friday, January 19. He testified that the defendant said the victim started a fight by punching him in the face, knocking off his glasses. The defendant said they engaged in mutual combat, and he eventually found some duct tape in a pile of junk in a corner. The defendant told Detective McCarter that he threw the laundry bag over the victim's head to disorient the victim so he could escape. He told Detective McCarter that he slit the bag to allow the victim to breathe.

Detective McCarter testified that the defendant told him he never punched the victim in the face because he knew the victim was a restaurant worker. He said the defendant told him that his primary goal was to detain and disorient the victim in order to get out of the apartment. Detective McCarter said the victim's hands were taped differently than how the defendant explained it in his statement. He said the defendant stated that he thought the victim was alive and breathing when he left the apartment. He also said the defendant stated that he left the duct tape at the apartment and placed a table upright that had been knocked over during the struggle.

On redirect examination, Detective McCarter testified that the defendant is six feet, three inches tall and weighs two hundred pounds. He said that when he and the other officers first spoke with the defendant at the defendant's home, the defendant refused permission to take photographs of his hands. He said that when the defendant came to the station and made a statement, the defendant said that he walked from his house to the victim's apartment at about 11:30 p.m. on Friday night. He testified that the defendant said that he smoked marijuana with the victim that night, then told the victim he was not going to buy any more marijuana from him. He stated that the defendant said this made the victim angry, and the victim cursed and yelled. He said the defendant told him that the victim went to the kitchen, came back out and threw a rock at him.

Detective McCarter testified that the defendant told him that the victim then got a knife. He stated that the defendant said he knocked the knife away and as they struggled, he saw the duct tape. Detective McCarter said the defendant stated that he got on top of the victim and taped his hands and legs together. He said the defendant told him that the victim's hands were ten inches apart, outstretched and straight over the victim's genital area. Detective McCarter testified that at the scene, the victim's hands were not ten inches apart; rather they were tightly taped together. He said the defendant told him that he screamed for Ms. Capiello about twenty times. He said the defendant told him that once he bound the victim, he turned on the television, turned off the lights and left. He said the defendant stated that the victim was moaning and breathing shallowly when he left and that he left the apartment door

cracked. Detective McCarter testified that at the scene, the table the victim claimed was knocked over during the struggle was standing upright with a coffee cup containing coffee and a cigarette tray containing ashes on top of it.

On recross-examination, Detective McCarter stated that he found several clumps of hair at the scene, and one clump was in the victim's hand. He said that the defendant told him that when he was on top of the victim, the victim grabbed his hair, pulling him back.

Karen Lanning, a forensic examiner with the FBI Trace Evidence Unit, testified that she examined the hair found at the scene, and the hair was consistent with the defendant's hair and inconsistent with all other samples provided to her. She said the defendant's hair was also found underneath the victim. She said that all of the hair found on the victim's clothing came from either the victim or the defendant. She said it looked like the hair from the defendant had been forcibly removed and would be consistent with the victim having pulled the defendant's hair in a struggle.

Dr. Cleland Blake, the Assistant Chief Medical Examiner for Tennessee, testified that he was called to the victim's apartment on January 21, 1996. He said the victim's body was lying on the floor in the same position as when it was discovered. He said he saw a table and a rock collection partially overturned on the floor. He said the victim had a laundry bag over his head and was wearing blue sweatpants. He said that after removing the laundry bag, he saw that the victim's hands and feet were tightly bound with duct tape. He said the hands were crossed, and each hand was taped individually and then bound together tightly. He said that the victim had injuries to his face and knuckles and that the surface skin on his nose, chin and cheeks was rubbed off like an abrasion. He said the victim had free blood around his lips. He said the victim's knuckles and the backs of his hands were bruised, which indicated that his hands had hit a surface.

Dr. Blake testified that the victim had compression abrasions on his neck, which were associated with mild bleeding around the vessels inside the neck. He said the victim had compression fractures on seven of his ribs, and the fractures were consistent with someone jumping or sitting down hard on the victim's chest. He said he found bleeding around the carotid arteries, which was typical of squeezing and compressing the neck. He said the neck showed only abrasions and not significant outside bruises because one generally does not see bruises if a cloth or padding is used to squeeze the neck. He said the victim's injuries were consistent with choking or squeezing the neck. He determined that the cause of death was compression of the neck which cut off the oxygen supply and caused the victim to asphyxiate. He said the choking would have had to last at least five minutes, and the victim could not have died just from the bag being placed over his head. He said there had to be some compression.

On cross-examination, Dr. Blake testified that he did not examine the duct tape for the presence of teeth marks or saliva. He said he saw hair on the scene, including at least one clump of hair. He said the victim was smothered through the cotton bag, but he did not examine the inside of the victim's nose or his neck area for fibers from the bag. He admitted that in his report, he stated that the neck was symmetrical and unremarkable with no evidence of grasp marks or encircling lines, but he said he meant no marks consistent with strangulation, such as noose marks. He said the victim had external injury in the form of abrasions. He said he found no grasp marks on the neck, but the skin was rubbed off. He said the victim had internal bleeding around the neck vessels which showed that the neck was definitely squeezed. He said the bleeding around the neck was not from a kick or a chop but from progressive choking. He said he believed the choking was done through the cotton bag. He said that because the bag protected the skin, the only visible external injuries were abrasions. He said he could not estimate the time of death, but he could determine that the victim ate no more than one hour before he died. He stated that in his report, he put a question mark next to "compression marks from asphyxiation effort." He said his initial impression was that there was compression through the fabric, and he believes that the compression was the cause of death.

State v. William B. Thurbley, No. 03C01-9709-CC-00414, 1999 Tenn. Crim. App. LEXIS 457, at **10-20 (Tenn. Crim. App. May 11, 1999), aff'd and remanded for correction of record, 1999 Tenn. LEXIS 663 (Tenn. Dec. 13, 1999).

The petitioner filed a *pro se* petition for post-conviction relief on December 11, 2000, followed by an amended petition on January 23, 2004, after the appointment of counsel, and a supplement to the amended petition on November 30, 2004. Generally, the complaints are against both pre-arrest counsel and trial counsel, alleging as to trial counsel that he was ineffective in his pretrial preparation, his opening statement, in the theory of defense, his introduction during cross-examination of the defendant's statement to law enforcement officers, his attempting to establish the defendant's character, and his preventing the defendant from testifying in his own behalf. Additionally, he argues that the State intentionally withheld evidence at the trial; the State failed to elect which offenses were being submitted to the jury; the trial court erred in requiring that pretrial motions be argued on the day of trial; and he was denied his rights.

At the petitioner's March 7, 2005, evidentiary hearing, pre-arrest counsel testified that he had been practicing law since 1982, with "[a]bout half" of his practice devoted to criminal defense. He said that the petitioner retained him because of "his concern about protecting him as it related to a death where he might be a suspect or might be questioned." He said that the petitioner "didn't hire [him] for the murder" and paid "about $2,000.00 pre arrest to protect him, make sure they didn't pressure him, that kind of thing." Counsel was retained "just to make sure that he didn't give a statement, do a little investigation. I did investigation. I hired an investigator." Counsel explained his efforts on behalf of the petitioner: He said he did not file a motion to withdraw from representing

-5-

the petitioner because "there was no one to file it with. [The petitioner] was not under charges when he came to me and I wouldn't have had a docket number or even a style of the case." He said that he did not believe it was necessary to send a letter to the petitioner saying their attorney-client relationship had ended because "it pretty well figured since he was doing what I had told him not to do he had pretty well rejected my help."

Pre-arrest counsel described the circumstances of the petitioner's admissions to law enforcement officers about the homicide: "[The petitioner] came with this preacher fellow and went to the sheriff's department, asked for Detective McCarter and said I've got something I want to tell you and he did so without telling me he was doing it." Counsel said he had advised the petitioner "not to give any statements of any kind." He said while he was on vacation, he received a telephone call from the petitioner and told him, and perhaps Detective McCarter as well, "[D]on't talk [to] him, he's represented." He gave this advice because he "felt like if [the petitioner] didn't give a statement he probably couldn't get convicted." Regarding his work on the case, counsel testified:

> [The investigator] and I and [the petitioner] met many times and discussed what it is [the petitioner] told us about the incident. We went to and met with Mr. McCarter and two or three other law enforcement to make it known that we didn't intend to give a statement. I think [the petitioner] was, as I recall, rather nervous about all this and scared. He sort of wanted them to either leave him alone or arrest him.

The petitioner testified that pre-arrest counsel never told him that his representation was limited to pre-charge matters. Although he had paid counsel $2000, signed "a letter of representation," and agreed to pay counsel an additional $2300, the petitioner requested a court-appointed attorney at his arraignment because counsel had "f[allen] off the radar screen. Untouchable, you couldn't get a hold of him. I showed up at his office, made phone calls, no answers. They put me on hold, half an hour later they'd hang up." The petitioner said he called counsel "[c]lose to twenty times over the months." The petitioner acknowledged that he was "itching to talk" to the police and that he told pre-arrest counsel he wanted to give a statement. Counsel told him, "I don't care what you do." He said that he had taken Paxil, Xanax, and Ambien and smoked three marijuana cigarettes prior to giving his statement on January 30 and that his pastor, Gary Gray, was present when he gave his statement.

The petitioner said that the public defender's office was subsequently appointed to represent him, but the public defender had a conflict of interest and "tr[ied] to get out of representing [him]." When the petitioner talked to the public defender on May 22, 1996, approximately one month after he was arrested, trial counsel was "very heated" and told him "he didn't want any part of [the petitioner], didn't want anything to do with [the petitioner]." He eventually met with trial counsel one to two months later. The petitioner said he did not receive a copy of counsel's motion to withdraw until after he was in prison and did not see counsel again until the day of the conflict of interest hearing. He met with counsel again about two months later and then on January 6, 1997, which was about five months before trial. He described the meetings as "very, very quick, informal

. . . . [Counsel] might ask me one or two questions, that was the end of the meeting." At the January 6 meeting, counsel informed the petitioner that he was not going to testify, saying, "[Y]ou never put your defendant on the stand." The petitioner said he had no impeaching convictions at the time of his trial. The petitioner then received letters from counsel in March and April and called counsel's office and left messages with his secretary.

The petitioner identified Indictment No. 6791 for first degree felony murder including kidnapping and said that the first time he had seen it was "[a] couple of months ago" and that he was never arrested for that charge. He denied that counsel told him he was going to be tried for felony murder in the perpetration of a kidnapping. He said no investigator worked on his case, nor did counsel do any mitigation work. The petitioner said he remembered a videotape depicting the victim's body "with a laundry bag over his head and with duct tape around his ankles and duct tape around his wrist" being shown to the jury at trial.

Asked what he thought when trial counsel told the jury that he had not committed a crime although he had given a statement admitting he tied up the victim, the petitioner said, "I couldn't believe [trial counsel] said it." The petitioner acknowledged that trial counsel introduced character evidence as to his peacefulness. The petitioner said he was dissatisfied with the way counsel represented him, the number of times counsel met with him, and the quality of those meetings.

On cross-examination, the petitioner said he never received McCarter's "supplemental summary" regarding the evidence he collected. According to the petitioner, "none of the evidence that was picked up at the crime scene was ever fingerprinted or the reports thereof given to [him]." However, he acknowledged he had admitted in his statement that he had touched the duct tape. The petitioner said he knew that he did not have to give a statement without pre-arrest counsel being present, but he could not get in contact with pre-arrest counsel. He acknowledged that he talked to the public defender's office who told him to discuss the matter with pre-arrest counsel and not to "go near law enforcement."

The petitioner said he had wanted trial counsel to call Jimmy Sizelow as a witness at trial and acknowledged that counsel asked for a continuance in that regard which the trial court denied. He said that although Sizelow was not present at the time of the murder, his testimony "would have changed this whole thing quite a bit," explaining that Sizelow was present during drug transactions. He said that Sizelow was not present at the post-conviction hearing because he could not be located.

The petitioner said that he was also dissatisfied with trial counsel's cross-examination of Dr. Blake and that trial counsel had introduced his statement wherein he admitted he restrained the victim and cut a slit in the bag over his head. He acknowledged that trial counsel's theory of defense was self-defense and maintained that "the whole truth" did not come out at trial.

Gary Gray testified that he had been the petitioner's pastor and had accompanied him to the police station on January 30, 1996, when he gave his statement. He also met with the petitioner and pre-arrest counsel "at a restaurant one night," at which time pre-arrest counsel acted as if he were

going to represent the petitioner throughout the case. Gray said he did not agree with the way pre-arrest counsel "was handling things." He said that he did not notice any signs of intoxication from the petitioner the day he gave his statement and that the petitioner told the officers the same thing he had told him. It was Gray's opinion that pre-arrest counsel was going to represent the petitioner if he was charged with a crime.

Detective Jeff McCarter testified that the first time he met the petitioner was at the petitioner's house, "days after the homicide had occurred." The petitioner told McCarter that he did not want to give a statement at that time and had retained an attorney. The petitioner then telephoned pre-arrest counsel who informed one of the officers present that he did not want the petitioner to give a statement. McCarter said he spoke to pre-arrest counsel several times before the petitioner gave his statement. He did not notice any signs of intoxication on the petitioner the day he gave his statement.

Trial counsel testified that he had been employed by the public defender's office since 1989 and had handled many first degree murder cases. He was appointed to represent the petitioner in April 1996 and discussed potential witnesses and possible defenses, "[p]articularly self defense," with the petitioner. Counsel said, after "discussing the dangers" with the petitioner, he called character witnesses who testified as to the petitioner's peacefulness. Counsel said his advice to the petitioner about testifying at trial

> would have probably been not to take the witness stand because the defense was that he went to his preacher, they discussed what happened and they wanted to go tell the truth and that's what he did and his story was going to be told through that statement. And basically there wasn't anything in that statement that he'd have any problem with. He said that's what happened. And that would have been my advice, that you can't do anything but hurt yourself by testifying. But ultimately, [it] always come[s] down to the last witness, I tell my client, you have the opportunity to testify and it's your decision.

Asked if he had done all that he could with the petitioner's case, trial counsel replied, "In hindsight, the only thing I would have done differently is not call the character witnesses but I don't know of anything else that I could have done." Counsel said he met with Dr. Blake and studied some of his books which he used in cross-examination. Counsel said he received all of the petitioner's indictments and recalled that the State had a superceding indictment alleging kidnapping which he discussed with the petitioner before trial.

On cross-examination, trial counsel acknowledged that his office had between 1500 and 1750 active cases when he was appointed to represent the petitioner and that he had four assistants on staff. He also acknowledged that he did not have any co-counsel or an investigator to help with the petitioner's case. Counsel said that if he had had his current funding and resources at the time of the petitioner's trial, "[i]t would certainly be an easier job than it was at that time."

Trial counsel said he did not recall the victim having duct tape in his nose or mouth although Dr. Roach's report said there was duct tape obstructing the victim's nose, mouth, and sac enclosure. Counsel said he had not seen the "tip" from Mr. and Mrs. Parton that was provided to Detective McCarter, but if he had known about the tip, he would have issued a subpoena to the Partons at their last known address and would have called Detective McCarter. He acknowledged that he received letters from pre-arrest counsel and that pre-arrest counsel had evidence in his possession.

Trial counsel identified three letters, dated August 6, 1996, December 11, 1996, and March 12, 1997, that he sent to the petitioner. He read a portion of the March 12, 1997, letter wherein he informed the petitioner that his case had been set for trial for May 21, 1997, and that because he had two other murder cases set for trial in April, his time between then and the first of May would be devoted to the other cases. He acknowledged that, according to his letter, he would have had from the first of May to May 22 to "do the final preparation" for the petitioner's trial.

In response to questioning from the post-conviction court, trial counsel said he knew that the petitioner was being tried for first degree premeditated murder and felony murder.

Asked why he had questioned Detective McCarter about the petitioner's statement on cross-examination when the State had not asked about it on direct examination, trial counsel replied:

> I think I had some good reason to do it. But, yeah, I would have thought the State would have asked certain . . . at least questions about certain portions of that statement, on direct, and I'm surprised that they didn't.
>
> . . . .
>
> Again, thinking back seven or eight years and not recently reviewing the record, I don't know what other evidence they had to offer of that statement. You know whether it needed an answer in the way of that . . me introducing that statement or what. I would assume I introduced it for a purpose, to answer some evidence.

Trial counsel said it was "possible" that he had allowed the petitioner's statement to come in on cross-examination in order to advance a claim of self-defense.

At the conclusion of the hearing, the post-conviction court made oral findings of fact and conclusions of law, denying the petitioner post-conviction relief and, subsequently, entered a written order dismissing the petition.

## ANALYSIS

### I. Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

## II. Ineffective Assistance of Counsel

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the <u>Strickland</u> Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; <u>see also</u> <u>Overton v. State</u>, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the <u>Strickland</u> test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; <u>see also</u> <u>Goad</u>, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." <u>Black v. State</u>, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, <u>see</u> <u>Strickland</u>, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. <u>See</u> <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. <u>See</u> <u>Thompson v. State</u>, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. <u>See</u> <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in <u>Burns</u>, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

### A. Pre-arrest Counsel

The petitioner describes only in broad terms the alleged ineffective assistance provided by pre-arrest counsel:

> It is without question that [the petitioner] disregarded his attorney's advice by volunteering to be interviewed by Detective Jeff McCarter. Under textbook representation, [pre-arrest counsel] would have developed a rapport with his client that created an atmosphere of trust. That, in turn, would have negated the scenario created below, where a confused client goes from door to door in search of guidance. Here, [pre-arrest counsel's] efforts were aloof, to put it mildly. Yet, in all candor, the [petitioner] confesses that this issue may not be well received, especially in view of the Supreme Court of Tennessee's decision, entitled <u>Sepulveda v. State</u>, 90 S.W.3d 633 (Tenn. 2002).

-11-

As we understand, the petitioner, saying that he was a "confused client," claims that pre-arrest counsel was ineffective because he was "aloof." By his view, counsel should "have developed a rapport with his client that created an atmosphere of trust." The petitioner acknowledges that he gave his statement to law enforcement officers against the advice of pre-arrest counsel.

As to the petitioner's complaints against pre-arrest counsel, the post-conviction court noted that "there is nothing unusual, unethical or illegal about" an attorney being retained to represent a client only to a certain point in the criminal process. The court found that it should have been "obvious" to the petitioner that he had not retained pre-arrest counsel for continued representation. As the court succinctly stated: " [O]n the one hand [the petitioner] doesn't pay [pre-arrest counsel] for the balance of his representation and on the other hand he wants him to represent him in a trial of first degree murder case for $2,000.00. So you can't have it both ways." The post-conviction court determined the petitioner failed to establish that pre-arrest counsel had been ineffective, and the record supports this determination.

## B. Trial Counsel

As to the alleged ineffective assistance provided by trial counsel, the petitioner makes the general arguments that, had the public defender's office been better funded, trial counsel "could have done a better job for [the petitioner] had [h]e been better financed and furnished with an investigator." This is pure speculation. In fact, as to the claim that with more funding he could have done a better job for the petitioner, trial counsel instead said it would have been "an easier job than it was at that time." This claim is without merit.

Initially, we note that the petitioner consistently fails to recognize in his various complaints that, against the advice of counsel, he gave a statement to law enforcement officers, creating a problem for his trial counsel, as the post-conviction court explained:

> [Y]ou do what you can with what you've got. Every defense lawyer, including yours truly, has been in cases where not only were the facts against you but the law was against you. That was what happened to [trial counsel] in this case. This defendant had basically admitted to every fact necessary to constitute the crime charged except for the actual killing. That happened long before [trial counsel] got in the case and it happened, not on [pre-arrest counsel's] advice but on the advice of this defendant's pastor. Neither of these attorneys caused that to happen.

The petitioner, in his numerous and diverse claims of ineffective assistance of counsel, also fails to recognize that much of the strength of the State's case against him resulted from his ignoring the instructions of pre-arrest counsel and giving a statement to law enforcement officers, admitting that he taped the victim's hands and feet and placed a bag over his head but did so in self-defense. The careful taping of the victim's hands and feet, immobilizing him, and the fact that he had been strangled belie the petitioner's claims that he was attempting only to subdue the victim so that he

could escape. The petitioner does not suggest a trial strategy or theory which would have bridged his self-defense claim with the incompatible manner of the victim's death.

## 1. Pretrial Preparations

The petitioner makes the conclusory allegations, in asserting trial counsel was ineffective as to his pretrial efforts, that "relatively nothing was done to prepare for trial; thus, the services rendered were not within the range of competence of attorneys in criminal cases." As we understand, the specific claims as to trial counsel's allegedly deficient pretrial preparation are that had the pretrial motions been argued before the morning of trial, counsel might have "realize[d] that he was defending not one, but two counts of murder," those being first degree premeditated murder and felony murder; counsel failed to notify the petitioner that he had been charged with felony murder or provide him with a copy of the presentment charging him with the offense; and counsel failed to obtain a copy of the victim's death certificate, which, according to the petitioner, "contained very useful errors in connection to the victim's cause of death." The petitioner has failed to allege, much less show, that any of these claimed shortcomings affected the outcome of the trial and, thus, prejudiced him. Accordingly, the record supports the post-conviction court's finding that this claim is without merit.

## 2. Opening Statement

The petitioner complains that trial counsel was ineffective by saying, in his opening statement, that the petitioner was not "violent" and "had committed no crime":

> He's been a productive citizen, been a hard worker, and you'll have highly respected members of this community c[o]me in and tell you that they have known [the petitioner]. . . .
>
> He is a man of impeccable character; he is not a violent man. He is . . . one of the most respectable persons that these people have ever met, one of the nicest individuals, with children, with society, very polite and mannerly – not a killer.
>
> We're satisfied . . . that he had committed no crime.

Out of the lengthy opening statement of trial counsel, the petitioner has focused on these two short phrases to argue that trial counsel was ineffective. The problem with this criticism is that the petitioner neglected to question him as to why he had made these statements. As we have set out, the petitioner has the burden of proof to establish that trial counsel was ineffective and that he was prejudiced thereby. In view of his failure to present any evidence, such as questioning trial counsel about these claims, the petitioner can prevail only if, as a matter of law, the statements constitute ineffective assistance of counsel and the petitioner was prejudiced thereby. We conclude that, given the tenor and theme of the opening statement of the petitioner's trial counsel, the statements were consistent with the claim of self-defense. In any event, the petitioner failed to show that he was

-13-

prejudiced by the statements, especially given the strong proof against him. Accordingly, the petitioner has failed to establish that trial counsel was ineffective in this regard.

### 3. Theory of Defense

This complaint is based upon trial counsel's response to the court at the beginning of the trial when questioned as to the intended defense:

> Well, it's not a – it would be mainly part and parcel of it self defense, but there's more to it than that.
>
> . . . .
>
> Because of the situation that developed with my client down there at the victim's house that night, they were discussing marijuana, and my client not going to purchase any more marijuana from him because of a financial situation, and it sort of sent the victim into a tirade, calling and threatening my client, thinking he's going to be a narc . . ., and so forth. I think it's common knowledge that people who not only smoke marijuana, but deal in selling marijuana, may be paranoid more than others, and this paranoia caused by the presence of marijuana in his system could help explain the tirade that he did go into, and helps support our position that he was the initial aggressor in this.

The petitioner explains his ineffective assistance of counsel claim based on this statement by saying that "the sad truth that these services rendered in his behalf by trial counsel were not within the range of competence of attorneys in criminal cases. . . . And, but for [trial counsel's] deficient, perhaps absent[,] theory of defense, the results of the trial would have been different."

As the petitioner notes, trial counsel agreed in his testimony at the evidentiary hearing that, according to the question, the petitioner's statement to law enforcement officers became his theory of defense at the trial. We note, in considering this claim, that trial counsel was saddled with a statement made by the petitioner to law enforcement officers in which he admitted binding and immobilizing the victim but claimed he did so in self-defense. Even on appeal, the petitioner does not argue that the statement was not admissible.

As we previously have set out, the post-conviction court explained that the petitioner "had basically admitted to every fact necessary to constitute the crime charged except for the actual killing." The petitioner has not identified a theory which, if utilized by trial counsel, could have avoided the fact of his statement to officers.

The record supports the finding of the post-conviction court that the petitioner failed to establish that trial counsel was deficient in the defense theory he pursued at the trial.

-14-

## 4. Introduction of Petitioner's Confession

The petitioner argues that trial counsel was ineffective because, after the State had completed its direct examination of Detective Jeff McCarter, counsel questioned him about the petitioner's statement of January 30, 1996.

Although the matter had not been discussed on direct examination, during the cross-examination of Detective McCarter, defense counsel questioned him about the petitioner's statement to law enforcement officers. Through his questioning, counsel established that the petitioner, accompanied by his pastor, voluntarily went to the police station and gave a statement as to the death of the victim. In his statement, the petitioner said that he had taped the victim's hands and feet and placed a laundry bag over the victim's head to disorient him so he could escape from the victim, but he cut a slit in the bag so the victim could breathe. Detective McCarter said that the bag did have such a slit. The petitioner further told McCarter that the victim, armed with a knife, had initiated a fight, and the petitioner disarmed him after a three-to-four-minute struggle. The petitioner said that the victim had struck him and knocked off his glasses. Detective McCarter acknowledged that the wounds on the victim's hands could have been offensive wounds. As the petitioner had described in his statement, officers found a small box containing marijuana residue at the victim's residence. Detective McCarter agreed with counsel's statement that the petitioner had said he tried to avoid hitting the victim in the face and was trying to get out of the victim's house.

At the evidentiary hearing, trial counsel in his testimony suggested a reason he may have put this statement before the jury by asking Detective McCarter about it during cross-examination:

Q.      It was helpful, and assuming what I'm telling you is true, and we've got a record, okay, you would have to second guess yourself in raising that statement on cross examination?

A.      Again, thinking back seven or eight years and not recently reviewing the record, I don't know what other evidence they had to offer of that statement. You know whether it needed an answer in the way of that . . . me introducing that statement or what. I would assume I introduced it for a purpose, to answer some evidence.

Q.      Could it be possible that you have allowed the statement to come in on cross, when it wasn't brought in on direct, in order to somehow advance a self defense claim?

A.      Yes, that's . . . That's possible.

We note that when defense counsel questioned Detective McCarter about this statement during cross-examination at the trial, the State had not yet rested its case-in-chief. Further, the petitioner had talked with his girlfriend, Debra Loveday, who was on the State's witness list, and

-15-

given the same explanation as to how the victim died.[1] The record does not reflect whether she was present during the trial; and, at the evidentiary hearing, the petitioner presented no proof as to what, if any, use the State intended to make of the statement or whether the State would have called Loveday as a witness if Detective McCarter had not testified about the petitioner's statement. Trial counsel surmised that he might have cross-examined McCarter about the statement because it was the only method to put the petitioner's self-defense claim before the jury without subjecting him to what could well have been a devastating cross-examination.

The record supports the determination of the post-conviction court that the petitioner failed to establish trial counsel was ineffective in questioning McCarter about this statement.

### 5. Character Evidence

The petitioner argues that trial counsel was ineffective for calling as character witnesses Michael Cecil Howard, Gary Gray, Albert Cissero, and Joan McGill. According to the petitioner, these witnesses were called to testify as to his reputation for peacefulness and faced "damming inquiry."

Since the cross-examinations of these witnesses were very similar, we will review only the testimony of the first witness in this regard, Michael Cecil Howard. He testified on direct examination that he had known the petitioner for six years, both as a co-worker and on a social level, and that the petitioner had a reputation as being "[v]ery peaceful." On cross-examination, Howard was asked the following:

Q.      You've testified regarding his reputation for peacefulness, is that right, sir? Is it also a part of that reputation – have you heard that [the petitioner], on or about May 17, 1995, did assault his wife at that time, Debbie Lunsford, by grabbing her throat, kicking her feet out from under her, landing on top of her, and choking her. Had you heard that?

A.      I heard something about that, yes, sir.

Q.      Did you consider that report when you testified regarding his reputation for peacefulness?

A.      Yes, sir, because I went up there shortly thereafter, and I saw the one you're talking about, and she was not scratched, no – looked like she hadn't been touched at all.

---

[1]The appellate record contains a transcript of a statement given by Loveday on January 24, 1996, to an attorney apparently representing her. She stated the petitioner told her that, while he was at the victim's residence, the victim pulled a knife on him, they struggled, and the petitioner "wrestled [the victim] down" and "tied him up loose enough till he could get through."

Q.    So you just discounted that report?

A.    Yes, sir.

Q.    Had you heard that two days after that [the petitioner], long about May 19th, 1995, that he again assaulted Debbie Lunsford, his wife at that [time], sat down on her, and choked her.  Did you hear about that report also?

A.    No, sir.

Q.    You didn't hear that report?

A.    No, sir.

Q.    Now hearing that report and considering that, would that change your opinion as to his reputation for peacefulness?

A.    No, sir, because I know [the petitioner].

Q.    You know from your own personal knowledge, is that what you're saying?

A.    Yes, sir.

At the evidentiary hearing, trial counsel testified that he and the petitioner had jointly determined to present character proof:

A.    [T]he best I recollect we discussed how damaging that could be and I think we made the decision together and . . . we had very good character witnesses, in my opinion.  And he said the allegations that you cross examined him about weren't true and . . .

Q.    When you say "we decided this" and "he", you're talking about [the petitioner]?

A.    That's correct.

The other character witnesses were cross-examined in a similar fashion.  Trial counsel testified that he discussed with the petitioner the dangers of calling the character witnesses and the potential for the State to introduce damaging testimony about violent behavior.  He said they "made the decision together" to call these witnesses.  Counsel said, as to the trial, "the only thing I would have done differently is not call the character witnesses."  Even if the petitioner were correct that counsel erred in presenting character proof, he has failed to show, given the strength of the State's proof, that this testimony affected the outcome of the trial.

## F. Petitioner's Denial of Right to Testify

As we understand the petitioner's claims in this regard, they are that trial counsel "just told [him], you are not going to testify, that's that." However, trial counsel testified that the petitioner made the decision not to testify:

Q. Did you talk to him about him testifying in this case?

A. I know we did. The specific times that we did, I can't tell you. Did I tell him you will not testify, no, I didn't. My advice, under the circumstances of the case, would have probably been not to take the witness stand because the defense was that he went to his preacher, they discussed what happened and they wanted to go tell the truth and that's what he did and his story was going to be told through that statement. An basically there wasn't anything in that statement that he'd have any problem with. He said that's what happened. And that would have been my advice, that you can't do anything but hurt yourself by testifying. But ultimately, [it] always come[s] down to the last witness, I tell my client, you have the opportunity to testify and it's your decision.

As to this claim, the post-conviction court found the petitioner had failed to establish that he did not know he had a right to testify: "[T]here is no real evidence in this case to suggest that this defendant did know about his right to testify but I'm not imputing that to him. I'm just saying there's no evidence about that issue here."

The petitioner acknowledges Momon v. State, 18 S.W.3d 152, 168 (Tenn. 1999), is not given retroactive application because it did not establish a new constitutional right. However, he argues that this court should apply the criteria set out in State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991), and conclude that counsel was ineffective in advising that the petitioner not testify at his trial. This argument overlooks the fact that trial counsel testified it was the decision of the petitioner that he not testify. Further, we note that while the petitioner hinted that he could provide an apparently more benign explanation of what transpired between him and the victim, he did not suggest what this might have been.

We conclude that the record supports the determination of the post-conviction court that this claim is without merit.

## III. Withholding of Evidence by the State

In his brief, the petitioner explains his claim that the State withheld certain evidence from him:

Initially, a Discovery Request was filed. Secondly, the State did, in fact suppress evidence: the "tip" regarding the suspects, named "Parton"; the misplaced

duct tape and fingerprint evidence; the Supplement from Detective McCarter, which provided a wealth of information, were all suppressed by the State. Likewise, the Victims' Compensation denial, based upon the fact that the victim "may have been involved in illegal activity" was suppressed; and tangible evidence gathered at the scene of the homicide. And with reference to a suspect, named Dean Oakie, his polygraph examination, which indicated that he stole from the victim's residence, was suppressed. Finally, a letter written by "Irene and Dean" surfaced after trial, which provided that one of these individuals was "grateful for the time I spent with [the victim] the day of his death."

More significantly, [the prosecutor's] own, holographic trial notes provided that "If Dean Oakie stole, he wouldn't be the one to call and find the body. Let Irene do it. Let someone else do it. Never admit to being in apartment alone [and] finding body."

The post-conviction court found that this claim was without merit:

There is no evidence in this record of any Brady [v]iolations and specifically as it relates to any tip that Mr. and Mrs. Parton apparently gave to Detective Jeff McCarter. They're not here. They have not – The substance of their testimony has not been offered and the mere giving of a tip, while it might be subject to disclosure, since the disclosure in these proceedings, they're not here to testify.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963), the United States Supreme Court held that the prosecution has a duty to furnish to the defendant exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. The Court explained that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The duty to disclose extends to all information favorable to the accused whether the evidence is admissible or inadmissible, State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993), and to information "which might be useful to the defense[.]" Branch v. State, 4 Tenn. Crim. App. 164, 173, 469 S.W.2d 533, 536 (1969). However, the State's duty under Brady to turn over evidence does not extend to information that the defense either already possesses or is able to obtain or to information not in the possession or control of the prosecution. Wooden v. State, 898 S.W.2d 752, 755 (Tenn. Crim. App. 1994) (citing Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). Further, Brady does not require the State to investigate on behalf of the defendant. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984).

In order to establish a due process violation under Brady, a defendant must show the following:

1.   The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2.   The State must have suppressed the information;

3.   The information must have been favorable to the accused; and

4.   The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (citations omitted).

We will apply these principles to the petitioner's claims.  When shown the note referring to a "tip" and listing the names Ricky Parton and wife, Joy Parton, with the cryptic phrase, "429-0313 does not work," trial counsel said he "never saw it."  Post-conviction counsel then questioned trial counsel about this note by saying, "And Mr. and Mrs. Parton could have said maybe that Steve Hawkins did or that he did it, you know, somebody else besides [the petitioner]."  However, since neither Mr. nor Mrs. Parton testified at the hearing, the record contains no evidence as to what relevant information, if any, they might have had.  We note that the petitioner, in speculating that they might have testified that someone other than the petitioner killed the victim, fails to take into account his statement to Detective McCarter that he, himself, had bound the victim's hands and feet and placed a laundry bag over his head.

The so-called "duct tape and fingerprint evidence" refers simply to an eight-years-after-the-fact statement that, apparently, a fingerprint analysis had not been performed on the tape used to bind the victim.  Thus, as we understand this argument, the petitioner is claiming that the State suppressed evidence by not revealing that certain items had not been processed for fingerprints.  No authorities are provided in support of the argument that the State specifically must identify which items were not examined for the presence of latent fingerprints.  In view of the fact the petitioner admitted that he had bound the victim with the duct tape he found at the victim's house, it is unclear why the State would have checked the tape for the petitioner's fingerprints or how the presence of another person's prints on the tape would have benefitted him.  This claim is without merit.

The petitioner complains that the State suppressed "the [s]upplement from Detective McCarter, which provided a wealth of information."  Although what purports to be a copy of this supplement is contained in the appendix to the petitioner's brief, it was not entered into evidence during the hearing.  Accordingly, it is not properly before this court and cannot be considered.  Further, in his questioning of trial counsel, the petitioner did not explore the "wealth of information" to establish how it would have benefitted the defense.  This claim is without merit.

The petitioner argues that the State illegally suppressed "the Victim's Compensation denial, based upon the fact that the victim 'may have been involved in illegal activity.'"  What purports to be a copy of this denial is found only in the appendix to the petitioner's brief.  Accordingly, it is not in evidence and may not be considered by this court.  The purported results of the polygraph

examinations administered to "a suspect, named Dean Oakie, . . . which indicated that he stole from the victim's residence" are located in the appendix to the petitioner's brief, but not in evidence. Accordingly, we cannot consider the suppression claim as to this alleged document. Further, even assuming, *arguendo*, that this would have been admissible, the petitioner has not shown how it would have been material to the defense.

The petitioner argues that the State suppressed "a letter written by 'Irene and Dean' [which] surfaced after [the] trial, [and] which provided that one of these individuals was 'grateful for the time I spent with [the victim] the day of his death." Although a copy of what purports to be this letter is contained in the appendix to the petitioner's brief, it was not entered into evidence and, therefore, is not properly before this court. Accordingly, we cannot consider this claim. Further, the petitioner has not shown how this letter would have been material to the defense or suggested why it was admissible.

Although it is not entirely clear from the petitioner's brief, it appears he argues that the State should have provided a copy of "[the prosecutor's] own, holographic trial notes provided that 'If Dean Oakie stole, he wouldn't be the one to call and find the body. Let Irene do it. Let someone else do it. Never admit to being in apartment alone [and] finding body.'" The petitioner's brief does not reveal that at the evidentiary hearing he questioned any witnesses about this document, and he has provided no authorities or argument to support his apparent position that he is entitled to discover the written mental impression of the prosecutors. The post-conviction court concluded the petitioner had failed to establish that any Brady violations occurred, and the record supports this determination.

### IV.  Election of Offenses and Patchwork Verdict

The petitioner argues that the State did not elect between the offenses for which he was indicted, resulting in his being convicted of both first degree premeditated murder and felony murder. Additionally, in this regard, he argues that even though the trial court subsequently entered an order merging the two convictions, as directed by our supreme court, "that [order] had no effect on the piecemeal deliberation that surely resonated among jurors as they considered both charges."

As the petitioner recognizes, he stands convicted of only one offense. His argument, as we understand it, that the jury's verdicts were affected by the fact it was considering two homicide indictments, is based upon nothing other than speculation. The problem with this argument is that, on direct appeal, our supreme court merged the petitioner's convictions for first degree premeditated murder and first degree felony murder. Accordingly, as we understand this issue, it was resolved on direct appeal.

### V.  Arguments of Motions on Day of Trial

The petitioner argues that the trial court violated his right to due process by not hearing arguments on his motions until the day of trial. He supplies no authorities to support his claim that such a procedure may violate the due process rights of a defendant. Further, he has not attempted to

explain why this claim was not raised on direct appeal or, if properly raised as a post-conviction claim, how he suffered prejudice. Accordingly, this issue is waived. See Tenn. Code Ann. § 40-30-106(g).

## VI.  Cumulative Errors

As his final claim, the petitioner asserts that this court "will soon realize that a negative synergy fell upon the [petitioner's] trial as the result of the combination of constitutional deficiencies born from the Trial Court, the District Attorney, and Trial Counsel." We interpret this claim to be that an accumulation of errors prevented his receiving a fair trial. However, as we have set out, we conclude that his post-conviction claims are without merit. Further, even if there were trial errors, this claim is waived because it was not presented on direct appeal. See id.

## CONCLUSION

As we have set out, the record fully supports the findings and conclusions of the post-conviction court. Accordingly, we affirm the dismissal of the petition.

_____
ALAN E. GLENN, JUDGE